IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

U. S. STEEL MINING COMPANY, LLC,                   No. 00 CV 1758

                            Plaintiff

            v.                                     Terrence F. McVerry
                                                   District Judge

WILSON DOWNHOLE SERVICES,

                    Defendant

## PETITION TO VACATE ARBITRATION AWARD

Pursuant to section 10 of the Federal Arbitration Action, 9 U.S.C.A. §§ 1 et seq., Petitioner, U. S. Steel Mining Company, LLC, by undersigned counsel, files this Petition to Vacate Arbitration Award, and states the following for the consideration of this Honorable Court.

1. Petitioner, U. S. Steel Mining Company, LLC (hereinafter "Petitioner" or "USM"), was at times material to this case a Delaware limited liability company having its principal office at 600 Grant Street, Pittsburgh, Pennsylvania 15219.

2. Respondent, Wilson Downhole Services (hereinafter "Respondent" or "Wilson Downhole"), was at times material to this case a business unit of Smith International, Inc., having its principal office at 16740 Hardy Street, Houston, Texas 77205.

3. Venue and jurisdiction in this matter are established by the Order of Court staying proceedings in this case, which was entered by the Court (Honorable D. Brooks Smith) on June 18, 2002. The Order provides "that this

Court shall retain jurisdiction for purposes of the Federal Arbitration Act, and all matters that may require action of this Court …. in connection with the arbitration proceeding or resulting award."  A copy of the Order is attached hereto as Exhibit A.

## Procedural Background

4.  On September 5, 2000, USM filed a Complaint for Declaratory Judgment against Wilson Downhole in the above-captioned case, seeking a ruling that USM was not obligated to pay an additional $227,925 claimed by Wilson Downhole for certain drilling services performed by Wilson Downhole in 1998.

5.  Upon Consented to Motion to Stay Proceedings, this Court stayed the proceedings pending non-judicial resolution of the case by Order (Exhibit A) entered on June 18, 2002.

6.  The parties agreed to proceed to arbitration in Atlanta, Georgia, a neutral site, and selected Harry L. Griffin, Jr., Esquire (hereinafter "Mr. Griffin") of Atlanta as their arbitrator.  The Agreement of Reference to Arbitration is attached hereto as Exhibit B.

7.  For various reasons, principally cost and time savings, the parties mutually decided to resolve the case through mediation, rather than a formal arbitration hearing.

8.  Mediation was conducted in Atlanta on January 18 and 19, 2006.

9.  In connection with and as a condition of the mediation, the parties executed an Amendment to Agreement of Reference to Arbitration and an Agreement to Mediate, attached hereto as Exhibit C and Exhibit D.

10.  As set forth in Agreement to Mediate, Mr. Griffin was given the authority to make an award based upon 'the best and final offer' of each party, if settlement were not reached through mediation.

11.  Settlement was not reached by the parties, and each party submitted its best and final offer to Mr. Griffin on January 27, 2006.  A copy of Wilson Downhole's offer and supporting rationale is attached hereto as Exhibit E.  A copy of USM's offer and supporting rationale [without attachments] is attached hereto as Exhibit F.

12.  On March 10, 2006, Mr. Griffin sent a letter to the parties, attached hereto as Exhibit G, indicating that Wilson Downhole was entitled to receive the $294,333.52 set forth in its final offer. This letter did not contain any rationale for the award, as the parties expected and as was required by paragraph 14 of the Agreement of Reference to Arbitration.

13.  By letter of March 20, 2006, attached hereto as Exhibit H, USM requested that Mr. Griffin provide his rationale, without which rationale there was no award that Wilson Downhole could enforce or that USM could challenge.

14.  Mr. Griffin issued his award, with the necessary explanation (hereinafter "Award"), on March 29, 2006.  A copy of the Award is attached hereto as Exhibit I.

15. For the numerous reasons set forth hereinafter, USM challenges the Award, and the proceeding underlying the Award, as contrary to law and violative of due process.

## Specific Objections to Award

16. In the Award (Exhibit I), Mr. Griffin set forth his principal considerations for the Award:

- the credibility of the witnesses who were present at the mediation;

- a question of fact remained as to whether the payment of the purported dispositive change order was an accord and satisfaction of all Wilson's claims, absent express language in the change order to that effect;

- evidence that Wilson paid its subcontractor on a similar basis as it claimed against USS (sic);

- in view of the amounts claimed, whose offer appeared the more reasonable.

## Credibility of Witnesses

17. This was a mediation, not an arbitration at which witnesses offered sworn testimony and were cross-examined. There was no testimony offered by either party in the course of the mediation.

18. In contrast to an arbitration proceeding at which sworn testimony is offered, evidence adduced and a record created, the mediation giving rise to the issues before the Court involved none of these procedural safeguards.

19. The attorneys for the parties submitted to Mr. Griffin a Joint Exhibit Book; deposition transcripts containing the sworn testimony of Mary Ann Black

and other witnesses for both parties; and, following mediation, Final and Best Offers with supporting Memoranda (hereinafter collectively "Documents").

20.  As in any mediation, the attorneys interpreted the Documents and argued from the Documents.  As set forth clearly in the Agreement to Mediate (Exhibit D), the parties and Mr. Griffin understood that, as mediator, Mr. Griffin would evaluate and criticize each party's position and, in the appropriate manner, communicate that position to the other party in an effort to move the parties toward settlement.

21.  While representatives of both parties were present at the mediation, they did not testify and were not cross-examined by counsel.   Mr. Griffin did not question the representatives of either party, and no representative of either party made any statement or offered any information, when the parties and Mr. Griffin were together in common session.  USM's representatives were asked no questions and offered no information or insight in Mr. Griffin's sessions with USM alone.

22.  If Mr. Griffin questioned Wilson Downhole's representatives, or received information from the representatives of Wilson Downhole, rather than its counsel, he never communicated this information to USM or asked USM's representatives for any response to information he may have received from Wilson Downhole's representatives.

23.  There simply was no credibility issue to be decided.  There was no right or reason for Mr. Griffin to weigh credibility of persons, who were not

questioned and who did not speak to – let alone testify under oath about – substantive issues.

24.   Weighing credibility is an undue means and demonstrates a corruption of the mediation process.

**Unresolved Issue of Fact**

25.   Based on its payment of $1,046,682 to Wilson Downhole and a Change Order relating to and supporting such payment, USM advanced an accord and satisfaction defense to Wilson Downhole's claim for additional moneys.  USM argued, further, that unconditional acceptance of the substantial payment by Wilson Downhole created an estoppel.

26.   If there was an unresolved 'question of fact' as to the effect of USM's payment to Wilson Downhole and related Change Order, as explained in the Award, such question of fact would have to be resolved against Wilson Downhole.

27.   As claimant, the burden was upon Wilson Downhole, not USM, to prove its entitlement to the substantial moneys sought by Wilson Downhole.

28.   In changing his role from mediator to arbitrator, Mr. Griffin reasonably was required to recognize and apply that standard of proof.

29.   Mr. Griffin's admitted failure to do so is a manifest error of law.

30.   Regardless of how this Court views Mr. Griffin's disregard of a fundamental standard of proof, a ruling in favor of Wilson Downhole cannot be justified by, nor can it be rationally inferred from, the simple existence of a 'question of fact.'

**Payment to Subcontractor**

31.  In the Award, Mr. Griffin states expressly that there was "evidence that Wilson Downhole had paid its subcontractor on the same basis as it claimed against USM."

32.  There simply was no 'evidence' of any payment to a subcontractor presented by Wilson Downhole to Mr. Griffin.

33.  Wilson Downhole's post-mediation submissions (Exhibit E) are replete with references to the 'testimony' of Mary Ann Black, an employee of Wilson Downhole.

34.  According to Wilson Downhole's post-mediation submissions, Mary Ann Black 'testified' that "Wilson needed $165,821.70 to recover Wilson's out-of-pocket expenses paid on USS's (sic) behalf."   Mary Ann Black also told Mr. Griffin that Wilson Downhole's $165,821.70 final offer represented only a .25% profit margin on the drilling of the three wells in question.

35.  Neither of these assertions, which influenced Mr. Griffin and caused him to find in favor of Wilson Downhole, was shared with USM in the course of the mediation by Mary Ann Black or other Wilson Downhole representatives or, more critically, by Mr. Griffin.

36.  There was no deposition testimony from Mary Ann Black or any other Wilson Downhole representative describing these or any other costs, or Wilson Downhole's obligations to its subcontractors.   No pre-mediation discovery or submissions by Wilson Downhole contained any such costs or obligations.

37.  The Joint Exhibit Book, prepared and provided by the parties to Mr. Griffin for his reference during the mediation, contained absolutely no information about, let alone proof of, subcontractor costs incurred by Wilson Downhole or about Wilson Downhole's profit margin.

38.  The failure of Wilson Downhole to include subcontractor costs or profit calculations in the Joint Exhibit Book, or any other documentary submission or deposition testimony, precluded Mr. Griffin's consideration of Mary Ann Black's self-serving and unsubstantiated statements.

39. The information provided by Mary Ann Black was not evidence, and it was clear and prejudicial error for Mr. Griffin to treat it as 'evidence' or to accord it the significant weight he did without advising USM of the information and affording USM an opportunity to refute the information and Wilson Downhole's claim for damages based on the information.

40.  As with Mr. Griffin's 'question of fact' rationale, Mr. Griffin's stated reliance upon this recoupment theory is a manifest misapplication of West Virginia law, which governs Wilson Downhole's claim for additional contract payment and Mr. Griffin's ruling on that claim.

41.  Like most other costs of contract performance, Wilson Downhole's obligation to its subcontractor, even if proven, is not compensable under West Virginia law.

42.  The Award based on subcontractor costs constitutes manifest error of law and is without any rational basis.

43.  Furthermore, secretive communication of such information to Mr. Griffin, his consideration of the information and his failure to divulge the information to USM's representatives, as the mediation dictated, constitute procedural corruption and fraud upon USM.

## Reasonableness of Wilson Downhole's Offer

44.  While Mr. Griffin was empowered by the parties to select from their 'best and final' payment offers following mediation, his exercise of discretion had to have a rational basis and draw its essence from the contractual undertakings of the parties.

45.  Mr. Griffin deduced and explained that Wilson Downhole's offer of $294,333.52 was 'more reasonable' than USM's lower offer of $56,000 "in view of the amounts claimed" by Wilson Downhole.

46.  Whether the amounts of money claimed by Wilson Downhole's were accurate or highly exaggerated, no award in any amount can be justified by a comparison of the amount of the Award to the amount claimed by Wilson Downhole.

47.  Mr. Griffin's reliance on the amount of Wilson Downhole's claim in making his Award is manifestly irrational and prejudicial.

## General Objections to Award

48.  The mediation proceeding and ultimate Award to Wilson Downhole were without rational basis of any kind, and therefore were arbitrary and capricious.

49.  The Award did not draw its essence from, and cannot be explained in any rational way by reference to, the parties' Agreement to Mediate (Exhibit D) or to the mediation conducted by Mr. Griffin.

50.  The mediation conducted by Mr. Griffin deviated materially and improperly from the mediation bargained for by USM, and which USM had the right to expect.

51.  The Award did not draw its essence from, and cannot be explained in any rational way by reference to, the Documents that were selected by both parties and presented to Mr. Griffin.

52.  The parties acknowledged and agreed that the Documents were the best evidence of the transaction between the parties and proof of their respective positions to be considered by Mr. Griffin.

53.  There was no testimony by any witness, except for what USM concludes of necessity were communications by Wilson Downhole representatives to Mr. Griffin, which were highly improper both in their secretiveness and their effect on Mr. Griffin's decision-making.

54.  Mr. Griffin disregarded the nature and limits of acceptable evidence, as established by the parties, and relied on unsubstantiated assertions of Wilson Downhole in deciding the Award.

55.  Mr. Griffin failed to apply the higher standards of evidence and proof required of him, when his role changed from mediator to arbitrator and, as arbitrator, he was asked by the parties to make an Award.

56.  The mediation and Award were the product of manifest legal error, procedural corruption and undue means.

57.  USM has been denied procedural and substantive due process.

WHEREFORE, Petitioner, U. S. Steel Mining Company, LLC, respectfully requests that the Award in favor of Wilson Downhole Services be vacated in all respects, and that the claims of Wilson Downhole Services be adjudicated by this Honorable Court or in another arbitration proceeding pursuant to terms that may be mutually adopted and agreed upon by the parties.

A proposed Order is provided for the Court's consideration.

Respectfully submitted,

Yukevich, Marchetti, Liekar & Zangrilli, P.C.

By:    /s/   *Albert J. Zangrilli, Jr.*
_____
Albert J. Zangrilli, Jr., Esquire
Pa. I.D. 15929

11 Stanwix Street, Suite 1024
Pittsburgh, PA  15222-1324
(412) 261 - 6780
email: azangrilli@ymlz.com

/s/  *Anthony F. Jeselnik*

_____

Anthony F. Jeselnik, Esquire
Pa. I.D. 20650

Law Department
United States Steel Corporation
U. S. Steel Tower, Fifteenth Floor
600 Grant Street
Pittsburgh, PA  15219
(412) 433 - 2962
email: afjeselnik@uss.com

# Exhibit A



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

U. S. STEEL MINING COMPANY, L.L.C.,                     Civil Action No. 00-1758

                    Plaintiff
                                                        Judge D. Brooks Smith
          v.

WILSON DOWNHOLE SERVICES,

                    Defendant

### **ORDER OF COURT**

AND NOW, this __18th__ day of June, 2002, upon consideration of the Consented to Motion of plaintiff, U. S. Steel Mining Company, LLC, to Stay Proceedings Pending Non-Judicial Arbitration, it is HEREBY ORDERED that proceedings in this Court in the above-captioned case are and shall be stayed pending non-judicial arbitration. It is FURTHER ORDERED that this Court shall retain jurisdiction for purposes of the Federal Arbitration Act, and all matters that may require action of this Court pursuant to the Federal Arbitration Act and the parties' Arbitration Agreement in connection with the arbitration proceeding or resulting award.

                              _D. Brooks Smith_

                              D. Brooks Smith
                              Chief United States District Judge

cc: All Counsel of record

# Exhibit B

## AGREEMENT OF REFERENCE TO ARBITRATION

This Agreement of Reference To Arbitration ("Agreement") is effective this 29th day of May, 2002, by and between Smith International, Inc., and/or Ryan Energy Technologies USA, Inc., of which Wilson Downhole Services is a wholly owned operating unit ("Wilson"), and U. S. Steel Mining Company, LLC ("USM").

WHEREAS, this Agreement is made and is agreed upon by and between the parties for the purpose of effecting complete and final adjudication of the contract dispute between them, subject to the terms and conditions set forth herein, and for the purpose of withdrawal of all claims and counterclaims filed by Wilson and the declaratory judgment action initiated by USM with respect to that dispute at Civil Action No. 00-1758 in the United States District Court for the Western District of Pennsylvania (hereinafter the "Court" or "Court in the Pennsylvania Action"), which action is captioned *U. S. Steel Mining Company, LLC v. Wilson Downhole Services*. The action shall be referred to herein as the "Pennsylvania Action."

WHEREAS, in the Pennsylvania Action Wilson asserts a counterclaim against USM for damages in the amount of Two Hundred Twenty-Seven Thousand Nine Hundred Twenty-Five ($227,925.00) Dollars, plus interest, for drilling services rendered to USM at USM's Pinnacle Mine in or about 1997. A related action was filed by Wilson at Civil Action No. 00-G-2804-S in the United States District Court for the Northern

District of Alabama, which action is captioned *Wilson Downhole Services v. U. S. Steel Mining Company.*

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and intending to be legally bound, the parties promise and agree as follows.

1.    USM and Wilson agree to refer their dispute to one (1) arbitrator, who shall be selected by mutual agreement of the parties.  Selection shall be made and agreed upon in writing, and the person so selected shall agree in writing to serve as arbitrator, within thirty (30) days of receipt by USM's counsel of the fully-executed Agreement from Wilson.  The parties shall establish and agree in writing upon the amount of the arbitrator's compensation, which shall be divided equally between the parties. In the event that the parties do not select an arbitrator, or no arbitrator selected by the parties accepts the appointment in this thirty-day period (appointment and acceptance hereinafter referred to as "Arbitrator's Appointment"), for any reason, the parties shall submit a Joint Petition for Appointment of Arbitrator promptly to the Court in the Pennsylvania Action.  The Court shall make such appointment in the Court's exclusive discretion and in that manner deemed appropriate by the Court.

2.    All decisions of the arbitrator, including without limitation pre-hearing procedural decisions, evidentiary decisions and the final decision and award (the final decision and award hereinafter referred to as the "Award"), shall be made by the arbitrator.  Arbitration shall be conducted in accordance with the Federal Rules of Civil

2

Procedure and the Federal Rules of Evidence in effect at the time this Agreement is executed. No Local Rules of a United States District Court shall apply or be relied upon by the parties or by the arbitrator.

3.    Immediately upon the execution of this Agreement by the representatives of both parties, the parties shall present a Consent Order to the Court for the purpose of referring to arbitration all claims and counterclaims that have been plead, or could have been plead, in the Pennsylvania Action pursuant to this Agreement and the Federal Arbitration Act (the "FAA", 9 U.S.C. §§1, et seq.). The Court in the Pennsylvania Action shall retain jurisdiction of this matter for purposes consistent with this Agreement and the FAA. Notwithstanding the continuing jurisdiction of the Court as provided herein, the Award shall be final and binding upon both parties, and their predecessors, successors, subsidiaries, units and assigns. Any appeal from the Award shall be made to the Court and shall be limited to cases in which (a) the Award was procured by corruption, fraud or undue means, (b) there was evident partiality or corruption in the arbitrator, or (3) the arbitrator failed to disclose any fact required by paragraph 3 herein to be disclosed. Each party expressly waives any appeal pursuant to grounds provided for in the FAA, except for the grounds specifically set forth above.

4.    Prior to the Arbitrator's Appointment, the arbitrator shall disclose to the parties in writing any financial, fiduciary, family or other relationship between the arbitrator and either party or its counsel, or between the arbitrator and any individual or entity with any financial, fiduciary, family or other relationship with any party. Either

3

party may challenge the Arbitrator's Appointment or continued service of the arbitrator for lack of independence, impartiality or any other cause likely to impair the arbitrator's ability to render a fair and equitable decision by promptly filing a challenge in the Court, with a copy of the challenge and all supporting pleadings to be served simultaneously upon the arbitrator and the other party. The Court shall have sole discretion to uphold or dismiss the challenge. The Court's decision on the challenge shall be final and non-appealable. Further, the arbitrator may be removed at any time without approval of the Court upon mutual agreement of the Parties.

5.    Each party shall be responsible for its own legal fees and expenses regarding the controversy, including by way of example and without limitation, pre-arbitration litigation, arbitration of the dispute and any discovery conducted in connection with federal court actions in Texas, Alabama or Pennsylvania. The parties agree that they each shall be responsible for one-half of the fees and itemized out-of-pocket expenses of the arbitrator, as well as any costs associated with the conduct of the arbitration.

6.    USM and Wilson agree that the parties shall be permitted to conduct discovery prior to submitting their respective proofs to the arbitrator. The discovery period shall begin on the day following the Arbitrator's Appointment, as documented in writing, or appointment by Order of the Court, and shall end one hundred twenty (120) days from that date.

4

7.      Discovery shall be conducted pursuant to the Federal Rules of Procedure and the Federal Rules of Evidence. The parties by mutual agreement and stipulation may submit depositions, in whole or part, for use at the arbitration hearing in lieu of live testimony. All discovery disputes and issues shall be submitted to and determined by the arbitrator, whose decision shall be final and non-appealable.

8.      Within sixty (60) days of the end of the discovery period, Wilson shall file its expert report or, alternatively, notify USM in writing that no expert report will be filed by Wilson. For purpose of this Agreement, 'file' or 'filing' shall mean submission of the expert report to both the arbitrator and the other party and actual receipt thereof by the arbitrator and the other party. Within sixty (60) days of Wilson's filing, or written notification that no report will be filed, USM shall file its expert report or notify Wilson in writing that no expert report will be filed by USM. USM may file an expert report and present expert testimony, regardless of Wilson's decision regarding expert testimony or Wilson's failure to identify its expert witness. In the event that USM does file an expert report, Wilson shall be permitted to file a rebuttal expert report within sixty (60) days of the date of the filing of USM's report or, alternatively, shall notify USM in writing that no rebuttal expert report will be filed by Wilson. Within thirty (30) days following the filing of Wilson's rebuttal expert report or, if Wilson does not file a rebuttal expert report, within thirty (30) days of receipt by USM of Wilson's written notification that no rebuttal expert report will be filed, both parties shall file simultaneously and exchange Pre-Hearing Statements and pre-marked hearing exhibits. The testimony of any witness not so identified or exhibit not so exchanged shall be inadmissible for any

5

purpose at the arbitration hearing, regardless of when or for what purpose offered in the hearing.

9.      Thirty (30) days following filing and exchange of Pre-Hearing Statements and hearing exhibits by and between the parties, or as ordered by the arbitrator, but in no event sooner than thirty days following such filing and exchange, the arbitration hearing shall commence before a single arbitrator in Atlanta, Georgia, at that office or other site in or near Atlanta selected and mutually agreed upon by the parties. Failing agreement by the parties on a specific office or site for conduct of the hearing, the arbitrator shall determine and advise the parties of the hearing site. The parties shall respond to the arbitrator's request for specific hearing dates in a timely manner and shall cooperate fully in the scheduling and conduct of the arbitration.

10.     The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative.

11.     The arbitrator, in his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the adjudication of which would tend, in the arbitrator's opinion, to dispose of all or part of the case.

12.     The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. The arbitrator shall determine the admissibility, relevance and materiality of the evidence offered, and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant, or which does not conform to the requirements of this Agreement or to the Federal Rules of Evidence.

13.     As set forth in the contract between the parties governing Wilson's drilling services and the respective rights and obligations of the parties, the substantive law of the State of West Virginia shall govern the legal interpretations and decisions of the arbitrator.

14.     USM and Smith International, Inc., and/or Ryan Energy Technologies USA, Inc., for themselves and their units, subsidiaries, predecessors, successors and assigns, agree to abide by and perform any Award rendered hereunder within ninety (90) days of the entry of such Award, including without limitation, payment of a monetary award. If performance is not rendered timely and voluntarily, a judgment may be entered upon the Award in the Court and enforced by the Court or by another court of competent jurisdiction upon transfer of the judgment for purpose of enforcement of the judgment. Any Award or decision, shall be in a writing signed by the arbitrator stating the reasons upon which the Award or decision is based and offering sufficient explanation of the Award or decision and the arbitrator's reasoning for such Award or decision. In the arbitrator's exclusive discretion, the final Award of the arbitrator may,

7

but need not be, accompanied by separate findings of fact or conclusions of law. The arbitrator shall render the Award on the merits of the claims and defenses within sixty (60) days of the conclusion of the arbitration hearing, unless an extension is requested by the arbitrator and granted by mutual agreement of the parties. The Award shall be based solely on the evidence presented and on the substantive law of West Virginia as applicable to the claims and defenses of the parties.

15.    Immediately upon the execution of this Agreement, Wilson shall dismiss with prejudice the action commenced at Civil Action No. 00-G-2804-S in the United States District Court for the Northern District of Alabama, which action is captioned *Wilson Downhole Services v. U. S. Steel Mining Company.*

16.    USM and Wilson agree that the arbitration Award shall be maintained in strict confidence by both parties and their representatives.

IN WITNESS WHEREOF, the parties, by their duly authorized representatives, have set their hands and seals on the dates below written.

Smith International, Inc. and/or Ryan Energy Technologies USA, Inc.

By _Miriam M. Cline_

Title _Assistant Secretary_

Date _May 29, 2002_

U. S. Steel Mining Company, LLC

By _William K Schlampp_

Title _Director of Purchasing_

Date _May 15, 2002_

8

# Exhibit C

## AMENDMENT TO AGREEMENT OF REFERENCE TO ARBITRATION

This Amendment, effective this 130 day of ___JANUARY___, 2006, to that certain

Agreement of Reference To Arbitration dated May 29, 2002 ("Agreement"), by and between

Smith International, Inc., and/or Ryan Energy Technologies USA, Inc., of which Wilson

Downhole Services is a wholly-owned operating unit (collectively, "Wilson"), and U. S. Steel

Mining Company, LLC ("USM").

1.    The Agreement is amended as follows:

     A.    <u>Single Arbitrator.</u>  The mediation and arbitration as described below shall be conducted before a single neutral mediator/arbitrator; namely Harry L. Griffin, Jr. ("Arbitrator").

     B.    <u>Time and Placeof Proceedings.</u> It is the intent of the Parties that the Parties will engage in mediation on January 18-19, 2006 beginning at 9:30 AM Eastern time each day. The Mediation shall be held at the Wyndham Midtown Atlanta, 125 10th Street, NE, Atlanta, Georgia. The Parties will endeavor in good faith to negotiate and execute the Agreement to Mediate as submitted by Mr. Griffin

     C.    <u>Initial Mediation.</u>  Each Party shall submit to the Arbitrator a position statement not to exceed ten (10) typed pages outlining the Party's position and identifying those documents the Party deems relevant to the dispute to be mediated.  The position statements shall be delivered to the Arbitrator no later than 5:00 PM, Friday, January 13, 2006.  During the time referenced in subparagraph B, the Parties will use best efforts to reach a mutually agreeable resolution of all pending disputes according to the terms of the Agreement to Mediate.  Each Party shall bring or have otherwise available at least one person with knowledge (as opposed to a principal of a Party).  If, at the end of this time, the Parties have not reached a mutually agreeable resolution, the Parties will adjourn for a period of 7 calendar days.  During these 7 calendar days, the Parties may contact each other to further discuss settlement of the dispute, but are not required to do so.

     D.    <u>Baseball-style Arbitration.</u>  If the Parties are unable to reach a mutually agreed resolution of all claims by 12:00 PM Eastern time, January 26, 2006, each Party shall, by written instrument, communicate its final and best settlement offer to the Arbitrator no later than 5:00 PM Eastern time January 27, 2006.  A Party's final and best settlement offer should contain a numerical value in U.S. dollars for consideration by the Arbitrator in determining his final award.  The Arbitrator shall, within ten (10) working days after receiving the last of the Party's final and best offers, select that offer he deems fair and just based on all information and evidence within his possession or provided by the Parties.  The Arbitrator's decision shall be final and unappealable.

E.    Failure to Participate. In the event a Party, having been given notice and opportunity, shall fail or shall refuse to appear or participate in any stage of the mediation or baseball-style arbitration, the proceedings shall nevertheless be conducted to conclusion and final award. Any award rendered under such circumstances shall be as valid and enforceable as if both Parties had appeared and participated fully at all stages.

F.    Ex Parte Communications. The Parties anticipate that ex parte communications with the Arbitrator will occur during the course of the mediation. The Parties agree that the Arbitrator, in evaluating each Party's best and final offer, may rely on any information he deems relevant, whether obtained in an ex parte communication or otherwise, in making his final award.

2.    A copy of this Agreement may be filed with the United States District Court for the Western District of Pennsylvania if necessary to enforce any rights of any party.

3.    The Parties affirm that they have entered into this Amendment, and the mediation and arbitration provided for herein, voluntarily, knowingly, and after full opportunity for consultation with legal counsel of their choosing.

4.    The Agreement of Reference to Arbitration dated May 29, 2002, is hereby ratified and confirmed and shall remain in full force and effect except as otherwise provided for and modified in and by this Amendment.

5.    This Amendment may be executed in facsimile counterparts, any of which shall be deemed an original document.

IN WITNESS WHEREOF, the parties, by their duly authorized representatives, have set their hands and seals effective the day and year first above written.

Smith International, Inc. and/or Ryan          U. S. Steel Mining Company, LLC
(A)Energy Technologies USA, Inc.

By _Croof M. Sv—II_          By _Ltt Jam A_

Title _Attorney for Smith/Wilson Donahle_    Title _ATTORNEY FOR U.S. STEEL MINING co., LLC_

Date _1/13/06_          Date _JANUARY 13, 2006_

HOUSTON 860785v2

# AGREEMENT TO MEDIATE

This is an agreement between U.S. Steel Mining Company, LLC and Smith International, Inc., successor-in-interest to Wilson Downhole Services, Inc., (hereinafter referred to as the "Parties"). The Parties have agreed to enter into mediation with the intention of reaching a consensual settlement of their dispute. The Parties have agreed upon Mr. Harry L Griffin, Jr., Esq. as the Mediator for this matter.

1.    The Parties understand that the purpose of the mediation is to attempt to find a mutually acceptable resolution of the dispute through cooperative attempts to solve the problems which presently separate them. To achieve a mutually acceptable resolution, the Mediator, the Parties and their counsel will work to ensure that each party understands the facts asserted and the contentions of all parties.

2.    In order for the mediation to be successful, open and honest communication is essential. Accordingly, the parties are urged to make complete, candid and accurate disclosure of all matters relevant to the underlying dispute.

3.    The Mediator, the Parties and their counsel shall treat all communications as strictly confidential. The Mediator will not disclose any information learned during the mediation without the express permission of the Parties and their counsel. Confidential matters disclosed in a private meeting or caucus with one Party will not be divulged to the other Party without the consent of the Party making the disclosure. Further, any mediation statement submitted by either Party for use in connection with this mediation shall not be disclosed to the other Party without the prior consent of the Party drafting the mediation statement.

4.    In order to maintain confidentiality and in an effort to increase the potential for success of this Mediation, the Parties and their counsel, by this agreement, agree: (1) not to call the Mediator as a witness at any proceeding; (2) not to subpoena or otherwise seek discovery of any written materials in possession of the Mediator developed for or in the course of this mediation and (3) that all statements by any representative of the Parties made during this mediation will be considered as privileged communications made in connection with settlement negotiations and no such statement shall be used against the Party making the same, or its representative, in any legal proceeding. To the extent that the law permits discovery of any such statements or materials, the Parties hereby waive their rights thereto.

5.    The only exceptions to the confidentiality rules stated in Paragraphs 3 and 4 are (a) this agreement to mediate may be used in a proceeding to enforce the payment obligation of paragraph 11 and (b) any written agreement made and signed by the Parties as a result of this mediation may be used in any relevant proceeding, unless the parties, by written agreement,

decide otherwise.

6.     Nothing in this agreement shall be construed to prevent or excuse the Mediator from reporting matters such as crimes, imminent threats of bodily injury to a Party or any other person, or such other matters as to which the law imposes a duty to report.

7.     It is expressly understood by the Parties and their counsel that the Mediator does not offer legal advice in this mediation and is not functioning as an attorney whether or not the Mediator is, in fact, an attorney.  In this mediation, the Mediator's role is to aid the parties in seeking a fair agreement in accordance with their respective interests.   The construction of a proposed agreement and any question of law should be referred by the Parties to their own legal counsel.

8.     The Mediator will not represent any party or any participant in this mediation in any subsequent legal proceeding or matter relating to the subject of the mediation.

9.     The Mediator strongly recommends that each Party be represented by counsel to whom all questions of law should be addressed.  The Mediator will work with counsel for the Parties throughout the mediation to help facilitate an agreement.

10.     Mediation is a voluntary, non-binding process.  Either Party may terminate the mediation at any time.  The Parties, however, agree that the subject of termination is a proper one for discussion at the mediation.  The Mediator may terminate the mediation in the event he finds that one of the Parties is not acting in good faith, or if it is felt that further negotiations would not be productive.

11.     The Mediator's per hour rate for the mediation is as set forth in his letter to counsel for the parties dated July 23, 2004.  The Parties will divide equally the cost of the mediation, with each Party paying its proportionate share.  The per diem rate includes pre-mediation study time, travel time, mediation proceedings, and reasonable and necessary follow-up.  Follow-up after the formal mediation proceedings is often key to a successful settlement.  This per diem rate also includes all administrative charges which shall be paid by the Mediator, should the Mediator elect to utilize a mediation service for administration of this mediation.  The Parties shall have no independent obligation to pay such charges, which are performed at the request and for the benefit of the Mediator.

12.     The Mediator shall not be liable to any Party for any act or omission in connection with any mediation conducted under this Agreement.

2

13.    Each Party will be permitted to make a short opening statement at the outset of the Mediation. Such opening statement, however, should not exceed thirty minutes, unless the Parties and the Mediator agree otherwise.

14.    The Parties shall exchange the name(s) of the Party representatives attending the Mediation.

15.    This Agreement may be executed in separate counterparts which taken together shall constitute one and the same Agreement.


I have read, understand and agree to each of the provisions of this Agreement.


PARTY 1: _C.A. Sample, Atty. for U.S. Steel_    DATE: _JANUARY 13, 2006_
(May be signed by representative) _Mining G., LLC_


PARTY 2: _A.H.M. A—H_    DATE: _1/13/06_
(May be signed by representative)

3

# Exhibit D

## AGREEMENT TO MEDIATE

This is an agreement between U.S. Steel Mining Company, LLC and Smith International, Inc., successor-in-interest to Wilson Downhole Services, Inc., (hereinafter referred to as the "Parties"). The Parties have agreed to enter into mediation with the intention of reaching a consensual settlement of their dispute. The Parties have agreed upon Mr. Harry L Griffin, Jr., Esq. as the Mediator for this matter.

1.    The Parties understand that the purpose of the mediation is to attempt to find a mutually acceptable resolution of the dispute through cooperative attempts to solve the problems which presently separate them. To achieve a mutually acceptable resolution, the Mediator, the Parties and their counsel will work to ensure that each party understands the facts asserted and the contentions of all parties.

2.    In order for the mediation to be successful, open and honest communication is essential. Accordingly, the parties are urged to make complete, candid and accurate disclosure of all matters relevant to the underlying dispute.

3.    The Mediator, the Parties and their counsel shall treat all communications as strictly confidential. The Mediator will not disclose any information learned during the mediation without the express permission of the Parties and their counsel. Confidential matters disclosed in a private meeting or caucus with one Party will not be divulged to the other Party without the consent of the Party making the disclosure. Further, any mediation statement submitted by either Party for use in connection with this mediation shall not be disclosed to the other Party without the prior consent of the Party drafting the mediation statement.

4.    In order to maintain confidentiality and in an effort to increase the potential for success of this Mediation, the Parties and their counsel, by this agreement, agree: (1) not to call the Mediator as a witness at any proceeding; (2) not to subpoena or otherwise seek discovery of any written materials in possession of the Mediator developed for or in the course of this mediation and (3) that all statements by any representative of the Parties made during this mediation will be considered as privileged communications made in connection with settlement negotiations and no such statement shall be used against the Party making the same, or its representative, in any legal proceeding. To the extent that the law permits discovery of any such statements or materials, the Parties hereby waive their rights thereto.

5.    The only exceptions to the confidentiality rules stated in Paragraphs 3 and 4 are (a) this agreement to mediate may be used in a proceeding to enforce the payment obligation of paragraph 11 and (b) any written agreement made and signed by the Parties as a result of this mediation may be used in any relevant proceeding, unless the parties, by written agreement,

decide otherwise.

6.      Nothing in this agreement shall be construed to prevent or excuse the Mediator from re-porting matters such as crimes, imminent threats of bodily injury to a Party or any other person, or such other matters as to which the law imposes a duty to report.

7.      It is expressly understood by the Parties and their counsel that the Mediator does not offer legal advice in this mediation and is not functioning as an attorney whether or not the Mediator is, in fact, an attorney. In this mediation, the Mediator's role is to aid the parties in seeking a fair agreement in accordance with their respective interests.  The construction of a proposed agreement and any question of law should be referred by the Parties to their own legal counsel.

8.      The Mediator will not represent any party or any participant in this mediation in any sub-sequent legal proceeding or matter relating to the subject of the mediation.

9.      The Mediator strongly recommends that each Party be represented by counsel to whom all questions of law should be addressed.  The Mediator will work with counsel for the Parties throughout the mediation to help facilitate an agreement.

10.      Mediation is a voluntary, non-binding process.  Either Party may terminate the mediation at any time.  The Parties, however, agree that the subject of termination is a proper one for discussion at the mediation.  The Mediator may terminate the mediation in the event he finds that one of the Parties is not acting in good faith, or if it is felt that further negotiations would not be productive.

11.      The Mediator's per hour rate for the mediation is as set forth in his letter to counsel for the parties dated July 23, 2004.  The Parties will divide equally the cost of the mediation, with each Party paying its proportionate share.  The per diem rate includes pre-mediation study time, travel time, mediation proceedings, and reasonable and necessary follow-up.  Follow-up after the formal mediation proceedings is often key to a successful settlement.  This per diem rate also includes all administrative charges which shall be paid by the Mediator, should the Mediator elect to utilize a mediation service for administration of this mediation. The Parties shall have no independent obligation to pay such charges, which are performed at the request and for the benefit of the Mediator.

12.      The Mediator shall not be liable to any Party for any act or omission in connection with any mediation conducted under this Agreement.

13.    Each Party will be permitted to make a short opening statement at the outset of the Mediation.  Such opening statement, however, should not exceed thirty minutes, unless the Parties and the Mediator agree otherwise.

14.    The Parties shall exchange the name(s) of the Party representatives attending the Mediation.

15.    This Agreement may be executed in separate counterparts which taken together shall constitute one and the same Agreement.


I have read, understand and agree to each of the provisions of this Agreement.


PARTY 1: _~~Ct. Samth, Atty. fn U.S.Steel~~_    DATE: _JANUARY 13, 2006_
(May be signed by representative) _Mining G., LLC_


PARTY 2: _~~Ant M. Amt~~_    DATE: _1/13/06_
(May be signed by representative)

3

# Exhibit E

Direct: 713-752-4275
tguerino@jw.com

January 27, 2006

VIA FACSIMILE (404) 523-9655

Harry "Buck" Griffin
Griffin, Cochrane & Marshall
127 Peachtree Street
14th Floor
Atlanta, Georgia 30303-1810

      Re:     Private Arbitration; *U.S. Steel Mining Company, LLC v. Wilson Downhole Services* – Pittsburgh, Pennsylvania

Dear Mr. Griffin:

      Wilson Downhole Services, Inc. submits this, its "best and final" offer pursuant to paragraph 1(D) of the Amendment to Agreement of Reference to Arbitration:

## Best and Final = $294,333.52

      This figure is based on the sum of the following components:

1.      actual damages of $165,821.70; plus

2.      prejudgment interest of $128,511.82 as calculated at the statutory rate of ten percent (10%) **of simple kind** for seven and three quarter years (June 1, 1998 to January 31, 2006).

      This offer is reflective of Wilson's settlement offer of February, 1999, conveyed via letter from Mr. Paul Conti to USS as shown in Exhibit 25 of the arbitration exhibit book. It is also reflective of Ms. MaryAnn Black's testimony that Wilson needed $165,821.70 to recover Wilson's out-of-pocket expenses paid on USS's behalf. In the spirit of achieving a final resolution of this dispute, and after considering your assessment of the parties' respective positions provided last week in Atlanta, an award of actual damages of $165,821.70 represents a twenty-seven percent decrease from Wilson's original contract claim of $227,984.87.

      As is indicated in Wilson's brief memorandum on the issue of prejudgment interest, Wilson believes there can be no dispute that the statutory prejudgment interest rate in West Virginia for actions based in contract is ten percent simple interest. Accordingly, Wilson's best and final offer shown above includes ten percent simple interest from the date the latest of Wilson's invoices became due to the end of January, 2006.

      Finally, given USS's history of delays in this case, it is not unreasonable to expect USS will delay in paying any award. Accordingly, Wilson requests that you include an award of *post-*

January 27, 2006
Page 2

*judgment interest* at the rate of ten percent (10%) of simple kind from the date of entry of your decision to the date of payment by USS.

      If you have any questions regarding any of the foregoing, please do not hesitate to contact us. Please note my new contact information at the top of this letter.

Sincerely,

Anthony M. Guerino, II

AMG:th
Enclosure

## WILSON DOWNHOLE SERVICES'
## <u>CONFIDENTIAL FINAL OFFER MEMORANDUM</u>

Wilson Downhole Services, Inc. ("Wilson") submits this confidential final offer memorandum to the arbitrator, the Harry L. Griffin, Jr., in the matter of the private arbitration styled *U.S. Steel Mining Company, LLC v. Wilson Downhole Services, Inc.* For simplicities' sake, all references herein to exhibits shall indicate the exhibit number agreed to by the Parties' in their Arbitration Exhibit List submitted herewith.

## I.    Statement of Wilson's Position

Wilson does not believe that a lengthy recitation of its position is necessary. Wilson's positions on the issues of this case are detailed in its mediation memorandum and were discussed at length at the mediation. However, a brief review is provided below.

### Contract Construed Against the Drafter

USS drafted the bid specification package to which Wilson responded. Under contract law, the bid specification package, which constituted the majority of the parties' contract, must be construed against the drafter when ambiguities are encountered. USS ignored the drilling industry convention that unidentified footages shown on a well plan at the distal end of a well are considered measured depth. Wilson cannot be held responsible for USS's failure to properly communicate its desired specifications to Wilson.

### Course of Dealing

A course of dealing developed between the parties throughout the length of the entire project at the Pinnacle Field in Pineville, West Virginia. That course of dealing, which benefited USS through avoidance of costly and unproductive non-drilling and standby costs, involved USS (1) routinely altering its well specifications, (2) communicating those changes to Wilson, (3) obtaining a quotation of the cost increases associated with the requested changes, (4) instructing Wilson to make the requested changes after assuring Wilson that a change order would be issued to cover the increased costs, and (5) providing a change order to Wilson as promised at the end of each well. This course of dealing developed during the drilling of at least six wells over the course of several months before USS requested a new payment schedule.

Although the payment schedule may have changed with the drilling of Well DW-7, the course of dealing did not. USS altered its well plan (from that included with the specification package to one indicating legs with measured depths exceeding 4400') just prior to the start of drilling activities on Well DW-7. Wilson informed USS of the increased costs associated with USS's changes, USS accepted Wilson's costs and, through Mr. Zupanick, instructed Wilson to proceed with the drilling of Well DW-7. Wilson went on to complete three wells for USS under the revised pricing structure submitted to USS, but USS failed to issue a change order for the full cost of the changed specifications as they had promised. Instead, Wilson was left holding the bag to the tune of over $165,000. Wilson relied on USS's assurances that it would be paid the agreed upon price for the altered specifications on Wells DW-7 through DW-9, as Wilson had for the other Pinnacle Field wells. Wilson's reliance was reasonable under the circumstances,

and USS is liable to Wilson for damages incurred as a result of Wilson's reliance on USS's promises.

## USS Failed to Reject Wilson's Offer

Wilson submitted a re-bid immediately after being informed of the change in the specifications of Well DW-7. USS acknowledges that it received Wilson's re-bid and that it, again through Mr. Zupanick, instructed Wilson to begin drilling Well DW-7. USS has not provided any evidence that it, at any time following the start of Well DW-7 or the completion of Well DW-8, informed Wilson that it did not accept Wilson's re-bid. Wilson reasonably relied on USS's silence as an acceptance of a bid between merchants in the drilling industry. If USS did not accept Wilson's re-bid it had a duty to inform Wilson of such, so that Wilson could properly evaluate whether to proceed with the project. Wilson was under no obligation to drill any of the last three wells at the Pinnacle Field, and certainly would not have done so if it knew that USS would not pay it an amount sufficient to at least cover all costs its would incur on the project.

USS's failure to reject Wilson's re-bid, and subsequent instruction to begin work on Well DW-7, is at least a tacit acceptance, and at most an explicit acceptance, of Wilson's terms. USS, therefore, is liable to Wilson for the services Wilson performed at Pineville.

## Quantum Meriut

At the very minimum, USS is liable to Wilson for the fair market value of the services Wilson provided to USS at the Pinnacle Field. Ms. Black testified at the mediation that Wilson's $165,821.70 settlement offer in early 1999 represented only a 0.25% profit margin for Wilson for all work performed on the last three wells at Pineville. Wilson, therefore, was willing to settle for a profit of less than $5,000.00 on a million dollar job, simply to cover the third-party expenses Wilson incurred on USS's behalf. It cannot be disputed that such a minimal profit is at least a fair and reasonable value of Wilson's services.

USS obtained the benefit of Wilson's services through ownership of the Pinnacle Field wells and the coal bed methane collected therefrom. USS should not be allowed to continue to retain the benefits of Wilson's services without properly compensating Wilson for the same.

## Eye Witness Testimony

As has been previously noted, MaryAnn Black is a credible witness and provided highly reliable testimony during her deposition and at the mediation. Ms. Black indicated that she never agreed to any payment schedule that would not compensate Wilson on a per foot basis for any drilling past 3000' MD, nor did she ever agree to settle Wilson's claim for amounts that would not even cover Wilson's out-of-pocket expenses on the Pinnacle Project. Ms. Black's testimony is further bolstered by that of Paul Conti, who conducted many of late 1998 and early 1999 settlement discussions with USS.

USS has not offered any credible testimony to refute Ms. Black's statements, nor can they, because their witnesses, by their own admission, lack the requisite knowledge.

WILSON DOWNHOLE SERVICES, INC.
CONFIDENTIAL MEDIATION POSITION STATEMENT

Mr. Zupanick repeatedly stated in his deposition he had no recollection of most of the events at and around the time the Pinnacle Project was ongoing. He did, however, admit before being educated by Ms. Black and Mr. Conti on the conventions and terminology of the drilling industry, he lacked knowledge that would have been critical for a person designing a well plan (as he did for the specification package weeks earlier), a job that Ms. Black has been performing for at least thirty years. Further, Mr. Zupanick departed USS's employ late in the project to accept a position with a competitor of Wilson, thereby providing him with excellent motive to assure that Wilson's business relationship with USS take a turn for the worse and no reason to stand behind the promises he had made to Wilson before drilling on Well DW-7 began.

Mr. Trader admitted in his deposition that he did not really come onto the scene until after Mr. Zupanick's departure, and was not privy to Mr. Zupanick's interactions with Wilson prior to his taking over Mr. Zupanick's former position. Further, Mr. Trader admitted that his source of drilling footage and time information, the tower reports, was not as accurate as the readily available source Wilson used for its invoices, the third-party MWD reports. According to Mr. Hartlaub, he relied solely on Mr. Trader for information related to the quantities paid by USS for Wilson's services. Mr. Trader's source for this information is admittedly inaccurate and therefore, unreliable.

Mr. Hartlaub, as discussed above, admitted to relying solely on Mr. Trader's flawed calculations when issuing USS's short payment of Wilson's invoices. Further, during his deposition, Mr. Hartlaub could not even identify his own handwriting on many of the exhibits, further casting a shadow on his reliability as a witness in this case.

## II.    Conclusion

Under any one of four theories, USS is liable to Wilson for the short payment of Wilson's invoices for services performed at the Pinnacle Field in Pineville, West Virginia. Wilson put forth extensive documentary evidence supporting its position and offered **uncontroverted testimony** of highly reliable and credible witnesses detailing the facts of the parties' dealings both before, during and after completion of the Pineville Project.

While Wilson still holds to its position that it is rightfully due almost $228,000 for the services it performed for USS, in the spirit of obtaining a final resolution of this matter, Wilson now seeks only to cover its out of pocket expenses for third-party costs incurred on USS's behalf and for the loss of use of that amount of money for the last seven years.

Respectfully submitted,

**GARDERE WYNNE SEWELL LLP**

By: _Anthony M. Guerino, II_

Anthony M. Guerino, II
TBA No. 79255210
Shawn H. Foster
TBA No. 24038906

3 of 4

Telephone:     713-752-4275

ATTORNEYS FOR
WILSON DOWNHOLE SERVICES, INC.

OF COUNSEL:

GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 3400
Houston, Texas  77002
(713) 276-5752 Telephone
(713) 276-6752 Facsimile

# Exhibit F

# YUKEVICH, MARCHETTI, LIEKAR & ZANGRILLI, P.C.

### ATTORNEYS AT LAW

11 STANWIX STREET

SUITE 1024

PITTSBURGH, PENNSYLVANIA 15222-1324

TELEPHONE 412/261-6777

FAX 412/261-6789

January 27, 2006

<u>Via DHL and Facsimile</u>   (404) 523 - 9655

Harry L. Griffin, Jr., Esquire
127 Peachtree Street, Fourteenth Floor
Atlanta, GA  30303

Re:    U. S. Steel Mining Company - Wilson Downhole Services Mediation
        Best and Final Offer of U. S. Steel Mining Company

Dear Mr. Griffin:

The parties have not reached a settlement in this case.  Therefore, pursuant to paragraph
1(D) of the Amendment to Agreement of Reference to Arbitration, effective January 13,
2006, I respectfully submit for your consideration the Mining Company's best and final
offer of Fifty Six Thousand Dollars ($56,000.00), including interest.  The rationale for
this offer and supporting law and facts are provided herewith.

Thank you for your mediation of this case, and for your invaluable assistance in bringing
the case to a conclusion.

Very truly yours,

Albert J. Zangrilli, Jr.

AJZ/ph
enclosures

**PRIVATE MEDIATION / ARBITRATION**

U. S. STEEL MINING COMPANY, LLC,

Plaintiff

v.                                                    Harry L. Griffin, Jr., Esquire

WILSON DOWNHOLE SERVICES,

Defendant

**RATIONALE OF U.S. STEEL MINING COMPANY, LLC
FOR BEST AND FINAL OFFER
WITH SUPPORTING LAW AND FACTS**

---

U.S. Steel Mining Company, LLC ("USM") asserts that Wilson Downhole Services ("Wilson") is not entitled to any moneys beyond the $1,046,682 paid to Wilson in 1998 for the drilling of three wells, DW-7, DW-8 and DW-9, at USM's Pinnacle Mine in West Virginia. Wilson adduced no evidence at mediation – or even any kind of rational explanation – that would support its claim for the additional significant moneys and interest.

In the spirit of the mediation, and in the spirit of fairness that has characterized USM's treatment of Wilson throughout the parties' commercial and legal dealings, USM is offering Fifty-Six Thousand Dollar ($56,000), including interest, in payment to Wilson. The following is a brief explanation of USM's rationale for this offer.

Facts Denying Any Additional Obligation

Wilson's sole claim advanced at mediation is for $79,890 allegedly owed by USM for 7,296 feet drilled beyond 3,000 feet. [Conti Letter, Exhibit 25] [1] Wilson did not prove that USM agreed to pay Wilson both $800 / hour and $10.95 / foot for drilling beyond 3,000 feet. Neither did Wilson demonstrate that USM has an equitable obligation to pay both an hourly and a footage rate beyond 3,000 feet. The hourly rate alone was Wilson's compensation on the first six wells drilled by Wilson at Pinnacle, which was invoiced and accepted by Wilson.

Any issue regarding distance to be drilled, or concern voiced by Wilson for payment based on distances, were obviated by USM's acceptance of Wilson's measurements on which Wilson calculated its payments. See Mary Ann Black June 11, 1998 spreadsheets and June 29, 1998 Change Order No. 1 [Exhibits 20 and 24]. To compensate Wilson for drilling beyond 3,000 feet in each of the 9 legs drilled in the 3 wells (DW-7, DW-8 and DW-9), USM increased the hourly rate from $350 to $800, but would not pay $10.95 per foot drilled beyond 3,000 feet. [Change Order No. 1, Exhibit 24]. The substantial increase in hourly rate from $350 to $800 adequately compensated Wilson for drilling beyond 3,000, and was agreed to and accepted by Wilson.

The following facts demonstrate Wilson's acceptance and undercut Wilson's denial of agreement documented by USM in Change Order No. 1. After lengthy negotiations on pricing, extending from mid-March through mid-June of 1998, and culminating in a telephone conference among Mary Ann Black, Bob Hartlaub and Dave Trader on June 9, 1998 [Exhibits 38 – 43], Mary Ann Black prepared and faxed to Dave

---

[1] The Conti letter, and all other referenced documents, are attached to this summary of USM's position or identified as an Exhibit contained in the Joint Exhibit Book submitted by the parties at mediation.

Trader spreadsheets containing measurements and payment amounts acceptable to Wilson. [Exhibit 20]

In the mediation, Tony Guerino characterized these spreadsheets and data as "undisputed." Mary Ann Black testified in her July 28, 2004 deposition, at page 116, that the distances, units and prices she communicated to USM on June 11, 1998 "[are] giving them (USM) a break on the costs using my hours and my footages." (emphasis added) [Attachment C] In response to the agreement reached on pricing and payment amounts and Mary Ann Black's June 11 fax documenting that agreement, Bob Hartlaub issued Change Order No. 1 on June 23, 1998.

Mary Ann Black received the Change Order; Wilson was paid and accepted $1,046,682 unconditionally and without objection. Mary Ann Black did not object to the Change Order, or indicate that the Change Order was in any way wrong or incomplete. Neither Mary Ann Black nor any other Wilson representative said that the $1,046,682 payment was deficient or not in keeping with Wilson's understanding or agreement. Wilson never demanded more money from USM for eight (8) months following its receipt and acceptance of payment and ten (10) months following completion of the drilling.

Wilson's unrestricted and unconditional acceptance of USM's payment constitutes accord and satisfaction, the elements of which are (1) something of value is offered in full satisfaction of an obligation; (2) the offer is accompanied by such acts and declarations as amount to a condition that if the offered item is accepted, it is accepted in full satisfaction of the obligation; (3) the offeree is bound to understand that if he accepts

the offered item he does so subject to the condition imposed; and (4) the offeree actually

does accept the item. *Restatement (Second) of Contracts*, § 281; *McCormick v. Hamilton*

*Business Systems, Inc.*, 175 W.Va. 222, 332 S.E.2d 234 (1985). [Attachments A and B]

If Wilson's conduct is not found to be an accord, for any reason, its acceptance of USM's

substantial payment estops Wilson from claiming additional moneys from USM.

     Moreover, in total contradiction of Wilson's contention at mediation that Joe

Zupanick had agreed to pay both footage and an hourly rate for drilling beyond 3,000

feet, at no time during the course of the three-month negotiation regarding pricing did

anyone from Wilson ever allege a commitment by Joe Zupanick to pay Wilson more

money or on terms different than those set forth in Change Order No. 1. All discussions

and negotiations regarding payment and payment terms were between or among Mary

Ann Black, Paul Conti and Bob Hartlaub in the USM Purchasing Department in

Pittsburgh, not with Joe Zupanick, a mining engineer in Pineville, West Virginia.

     Had Joe Zupanick made the commitment that Wilson insists – belatedly – was

made, logic suggests that Wilson would have trumpeted that commitment in challenging

the Change Order and the amount of money paid to Wilson in June or July of 1998.

There was no such challenge. Furthermore, the sworn testimony of both Paul Conti and

Mary Ann Black establish that Joe Zupanick had made no commitment to Wilson.

     In his July 29, 2004 deposition, at pages 75 and 83, Paul Conti testified that he

had no personal discussions with Joe Zupanick regarding the specific prices proposed in

Wilson's re-bid. Paul Conti also indicated that (paraphrasing) he and Joe Zupanick had

no agreement between them regarding payment to Wilson for drilling beyond 3,000 feet.

According to the Conti testimony, Mary Ann Black related to him Joe Zupanick's

agreement to pay both footage and an hourly rate for that drilling beyond 3,000 feet. Mary Ann Black's testimony completely contradicts Paul Conti's testimony. In her July 28, 2004 deposition, at page 154, Mary Ann Black testified that it was Bob Hartlaub, who had agreed on behalf of USM to pay the rates proposed by Wilson in its re-bid. [Exhibit 14] She expressly denied that anyone else had made that agreement. Regarding Joe Zupanick, she testified, at pages 65 and 66, that he was "unhappy with the fact that there was miscommunication" and, most telling, that she did not discuss Wilson's proposed new rates with Joe Zupanick.

The exhaustive notes and contemporaneous accounts of the parties' negotiations written by Bob Hartlaub and Dave Trader establish conclusively that Wilson agreed to the measurements, pricing units and payments reflected in Change Order No. 1. [Exhibit 38, pages 1 and 5; Exhibit 41, page 3; Exhibit 42, pages 2 and 3; Exhibit 43, page 1; Exhibit 44, pages 2 and 3; Exhibit 46] Conversely, there is not one note or piece of paper produced by Wilson (at mediation or in the course of discovery), which supports Wilson's allegations that USM accepted Wilson's re-bid proposal or agreed to pay Wilson both an hourly rate and footage beyond 3,000 feet drilled in the legs of each well.

In this binding mediation, in which the mediator now has moved from role of conciliator to judge, Wilson now has the burden to establish a legally-valid claim and to provide reasonable factual support for that claim. While the very nature of mediation might obviate the strict 'preponderance of the evidence' standard, Wilson has not satisfied its burden to advance a reasonable recovery theory or to adduce reasonable

proof of (1) agreement, (2) breach of that agreement by USM and (3) damage to
Wilson justifying payment from USM.

For Wilson to recover additional moneys from USM, it is necessary for Wilson to
prove, not simply characterize, that USM agreed to pay those moneys. There is no such
proof, nor does any fact adduced by Wilson in the course of mediation permit an
inference, of any agreement by USM or of any equitable duty owed Wilson by USM.
This is a contract case involving two significant commercial companies.

In contrast to Wilson's unsubstantiated allegations and mischaracterizations,
USM has demonstrated an agreement reflected in and conclusively documented by Mary
Ann Black's June 11, 1998 spreadsheets [Exhibit 20] and the June 23, 1998 Change
Order [Exhibit 24]. Pursuant to that agreement, Wilson received substantially greater
moneys than USM would have paid Wilson under its original, best and final bid.
[Exhibit 7]

As the Change Order reflects, USM agreed to and did increase payments to
Wilson in each pricing unit, including the hourly rate for drilling in coal beyond 3,000
feet. That hourly rate was increased by $450, from $350 to $800. USM did not agree to
pay $10.95 / foot for drilling beyond 3,000 feet, in addition to the substantial increase in
the hourly rate. In the absence of USM's agreement, Wilson is not entitled to recover any
part of the $79,891 it is seeking in this mediation for footage beyond 3,000 feet.


Limitation on Recovery

Notwithstanding the invoiced amount of $227,924.73 for which Wilson sued
USM, and Wilson's $460,000 settlement demand at the conclusion of mediation on

6

January 19, 2006, Wilson's recovery is limited by the February 2, 1999 letter of

Wilson's Senior District Manager, Paul Conti. [Exhibit 25]

      The Conti letter is an admission that the $227,924.73 invoiced by Wilson in

March and April of 1998 is erroneous and that USM has no obligation to pay this

amount. By Conti's calculations and statements, the actual obligation is $165,821.70. As

USM demonstrated at mediation and reiterates here, the $165,821.70 figure itself is

exaggerated and erroneous. Of the $165,821.70 amount, $34,256.40 had been paid to

Wilson. The first two line items on page one of Change Order No. 1 show a total

payment of $60,000, or $30,000 each for mobilization and de-mobilization. [Exhibit 24]

Tony Guerino confirmed at mediation that the $30,000 sought by Wilson related to

mobilization or de-mobilization, and that the $30,000 had been paid. Wilson's request

for payment of $4,256.40 for lost tools and third-party charges was acknowledged and

paid by USM. [Exhibit 26; DW-8 explanation]

      Another part of Wilson's claim communicated in the Conti letter relates to an

additional $51,675 for stand-by and non-drilling day. [Exhibit 25; DW-7 itemization

sheet, paras. 1 and 3; DW-8 itemization sheet, para. 3]. However, Wilson did not pursue

this $51,675 claim at mediation, or attempt to explain this part of its claim. USM in fact

did pay Wilson according to the agreed-upon rate for stand-by and non-drilling time

submitted by Wilson. [Exhibit 24] USM's reasoning for not paying additional stand-by

or non-drilling moneys is explained in Bill Schlaupitz' June 18, 1999 letter to Greg Price,

Wilson's Vice President in Houston. As explained in the Schlaupitz letter, the parties had

discussed rates for stand-by and non-drilling day and Wilson had conceded that none of

the $51,675 was owed. [Exhibit 26; DW-7 and DW-8 explanations]

Assuming *arguendo* that Wilson is entitled to any payment beyond the $1,046,682 paid by USM in 1998 pursuant to Change Order No. 1, dated June 29, 1998 [Exhibit 24], such payment is limited to the principal amount of $79,890. In Conti's letter, Wilson claims that it is owed this amount for footage drilled in coal beyond 3,000 feet measured depth. This was the sole basis of Wilson's claim for additional moneys advanced at mediation.

For the reasons explained at mediation and summarized below, USM is willing to compromise this 'footage' claim by paying $40,000, or one-half of Wilson's $79,890 footage claim, plus ten (10) percent <u>simple</u> interest for four (4) years, or one-half of the approximately 8 years the claim has been outstanding. Ten percent interest rate is provided by governing West Virginia statute, West Virginia Code § 56-6-31. Compound interest is not recognized or permitted in West Virginia. *See Hensley v. State Department of Health & Human Resources*, 203 W.Va. 456, 508 S.E.2d 616 (1998). [Attachments C and D]

From the earliest days of the litigation initiated by Wilson in or about October of 1998, USM suggested immediate binding arbitration of Wilson's claim. The arbitration proposal was set forth in a December 18, 1999 letter and February 3, 2000 email from USM's counsel to Wilson's counsel. USM counsel asked expressly for Wilson to consider <u>dates in May or June of 2000</u> for the arbitration. [Attachment E] Wilson continued to litigate its claim unsuccessfully in three federal courts, until May 29, 2002. On that date, Wilson finally agreed to submit the case to arbitration and executed the Agreement of Reference to Arbitration.

USM should not be held liable for the significant interest that accrued unnecessarily during all of the years that Wilson pursued its claim in court(s) in disregard of USM's offer to resolve the claim expeditiously through arbitration. Moreover, the equal sharing of interest, and payment of significant interest by USM, is eminently fair and reasonable in this case in which USM has paid Wilson in excess of $1 million, and Wilson has failed to demonstrate any right to payment of any further money.

Respectfully submitted,

Yukevich, Marchetti, Liekar & Zangrilli, P.C.

By: _____

Albert J. Zangrilli, Jr., Esquire
Pa. I.D. 15929

11 Stanwix Street, Suite 1024
Pittsburgh, PA 15222-1324
(412) 261-6780

# Exhibit G

Direct Dial (404) 222-4307
Telephone (404) 523-2000

**Harry L. Griffin, Jr.**
Mediator
127 Peachtree Street, NE
14th Floor
Atlanta, Georgia 30303-1810

Direct Fax (404) 523-9655
E-Mail HLGriffin@gcm-atty.com

March 10, 2006

Albert J. Zangrilli, Jr.
Yukevich, Marchetti, Liekar
 & Zangrilli, P.C.
11 Stanwix Street, Suite 1024
Pittsburgh, PA 15222-1324

Anthony M. Guerino, II
Jackson Walker, LLP
1401 McKinney
Suite 1900
Houston, TX 77010

      RE:  U.S. Steel Mining Company v. Wilson Downhole Services
           Last and Best Offer

Dear Colleagues:

      I must confess I waited out the week in hopes that I would get a message from you that you had settled the case, obviating the necessity for an award. I received no such message and accordingly have to select one of the two last and best offers provided to me.

      It was not an easy task. I reviewed several times the submitted documents, my notes, and your written presentations, both the mediation statements and your statements in support of your offers.

      I considered providing the reasons for my selection. Upon reflection I elected not to do so. Whatever my reasons, the party whose offer I declined to select would disagree and could advance a multitude of reasons why I was incorrect in my rationale, or had overlooked persuasive contrary facts, but, in any event, would not be persuaded by my stated reasons.

      You both did a thorough and professional job. Had I been assigned the task to issue an award, as arbitrator after a full evidentiary hearing, I would have arrived at a lesser and different amount, but it would have approached the amount proposed by Wilson Downhole Services, Inc. Hence, after due deliberation I am compelled to select Wilson's best and final offer of $294,333.52. I do not view it in my scope of responsibility to deal with Mr. Guerino's request to provide for post-judgment interest as part of my award. I am certain counsel will address this issue hereafter by agreement or in connection with a likely motion to confirm. Another mediator qua arbitrator may very well have selected the best and final offer of U.S. Steel Mining Company, LLC for the very reasons advanced by Mr. Zangrilli.

March 10, 2006
Page -2-


     I thoroughly enjoyed working with all four lawyers and sincerely hope our paths cross again.  I was very appreciative and honored to have been selected by you to resolve the dispute.

                    Cordially,

                    Harry L. Griffin, Jr.

HLG/tfp

# Exhibit H



United States Steel Corporation
Law Department
600 Grant Street
Pittsburgh, PA 15219-2800
412 433 2962
Fax: 412 433 2811
email: afjeselnik@uss.com

**Anthony F. Jeselnik**
General Attorney

March 20, 2006

Via U.S. First Class Mail and Facsimile (404) 523 9655

Harry L. Griffin, Jr., Esquire
127 Peachtree Street, Fourteenth Floor
Atlanta, GA 30303-1810

Re:    U. S. Steel Mining Company v. Wilson Downhole

Dear Buck:

You have indicated in your March 10 letter that you elected not to provide reasons for
accepting Wilson Downhole's offer of $294,333.82. Paragraph 14 of the parties' Agreement
of Reference to Arbitration, dated May 29, 2002, requires that you explain your decision:

...... Any Award or decision, shall be in a writing signed by the
arbitrator stating the reasons upon which the Award or decision is based and
offering sufficient explanation of the Award or decision and the arbitrator's
reasoning for such Award or decision. In the arbitrator's exclusive discretion,
the final Award of the arbitrator may, but need not be, accompanied by separate
findings of fact or conclusions of law.

Without such explanation, I respectfully submit that your selection of Wilson Downhole's
figure does not constitute an award, and is not effective as an award on which judgment can
be entered. Your explanation would serve to cure the deficiency, and help USM business
persons understand and evaluate your decision.

I look forward to receiving your explanation, and I hope that all goes well with you.

Best regards,

Anthony F. Jeselnik

AFJ/

cc:    Geoffrey Bracken, Esquire
       Anthony M. Guerino, Esquire
       Albert J. Zangrilli, Jr., Esquire

# Exhibit I

Direct Dial (404) 222-4307  ⁄
Telephone (404) 523-2000

**Harry L. Griffin, Jr.**
Mediator
127 Peachtree Street, NE
14th Floor
Atlanta, Georgia 30303-1810

Direct Fax (404) 523-9655
E-Mail HLGriffin@gcm-atty.com

March 29, 2006

Anthony F. Jeselnik, Esquire
General Attorney
United States Steel Corporation
Law Department
600 Grant Street
Pittsburgh, PA  15219-2800

>    Re:    *U.S. Steel Mining Company v. Wilson Downhole Services*

Dear Tony:

I received your letter of March 20, 2006, asking that I explain my decision.  I do understand the parties' Reference to Arbitration of May 29, 2002 required that I, as arbitrator, make a typical reasoned award and offer "sufficient explanation of the award and the reasoning for such award."

Had I served as arbitrator as contemplated by the Reference, I would have made an independent decision on the facts and law and issued a reasoned award accordingly.  The Amendment to Agreement of Reference to Arbitration of January 13, 2006 did not permit me to make such independent decision but required me to select one of the two "final and best offers" submitted by the parties.  I did this and even stated in my March 10, 2006 letter selecting Wilson's offer that had I served as an arbitrator in a typical arbitration hearing, not as a mediator/baseball arbitrator with very proscribed authority, I would not have arrived at the same result.  While I normally do not (and have not before been asked to explain my selection in a baseball arbitration), I decided here to accede to your request.

In selecting Wilson's offer I will say that some of my considerations were:

- the credibility of the witnesses who were present at the mediation;

- a question of fact remained as to whether the payment of the purported dispositive change order was an accord and satisfaction of all Wilson's claims, absent express language in the change order to that effect;

- evidence that Wilson paid its subcontractor on a similar basis as it claimed against USS;

- in view of the amounts claimed, whose offer appeared the more reasonable.

These were some of the matters I considered, and are, by no means, meant to be exhaustive.

Anthony F. Jeselnik, Esquire
March 29, 2006
Page 2

I know you are disappointed with my selection of Wilson's offer and I understand your disagreement with my selection.  As I stated, another mediator/baseball arbitrator may well have selected your offer, for the very reason you and Mr. Zangrilli proposed.  I exercised my best judgment in selecting the offer I did.  I wish you all the best, as I do Messrs. Guerino and Zangrilli.

Cordially,

Harry L. Griffin, Jr.

bac

cc:     Albert J. Zangrilli, Jr., Esquire
        Anthony M. Guerino, II, Esquire

230541_1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

U. S. STEEL MINING COMPANY, LLC,                 No. 00 CV 1758

                    Plaintiff / Petitioner
            v.                                   Terrence F. McVerry
                                                 District Judge

WILSON DOWNHOLE SERVICES,

                    Defendant / Respondent

## **ORDER OF COURT**

        AND NOW, this _____ day of _____, 2006, upon Petition of U. S.

Steel Mining Company, LLC to vacate the March 29, 2006 Award in favor of

Wilson Downhole Services entered by Harry L. Griffin, Jr., and response of

Wilson Downhole Services, it is HEREBY ORDERED AND DECREED that the

Award is and shall be vacated in its entirety.

        It is FURTHER ORDERED that, within thirty (30) days of the entry of this

Order, the parties shall inform this Court in writing whether they wish to proceed

to trial in this Court or to arbitration with a new arbitrator.


                                    _____
                                    Terrence F. McVerry
                                    United States District Judge

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 3rd day of July, 2006, a true and correct copy of the foregoing Petition to Vacate Arbitration Award has been served upon each of the following counsel of record electronically and by the methods set forth below:

Geoffrey H. Bracken, Esquire          (First Class U.S. Mail)
Gardere Wynne Sewell LLP
Wells Fargo Plaza
1000 Louisiana, Suite 3400
Houston, TX   77002-5007


Kimberly A. Brown, Esquire          (Hand Delivery)
Thorp Reed & Armstrong
One Oxford Centre, 14th Floor
301 Grant Street
Pittsburgh, PA   15219-1425


/s/   *Anthony F. Jeselnik*
_____

Anthony F. Jeselnik, Esquire